IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MIRIAM LAWRENCE, | ) | CASE NO. 1:16CV885 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Miriam Lawrence ("Lawrence") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying her application for
Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42
U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of
the parties.  Doc. 12.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

### I. Procedural History

Lawrence protectively filed an application for SSI on October 29, 2012, alleging a
disability onset date of October 1, 2012.  Tr. 15, 202.  She alleged disability based on the
following: slipped disk in back, pinched sciatic nerve, and "knee pain—difficulty standing and
shooting pains."  Tr. 208.  After denials by the state agency initially (Tr. 79) and on
reconsideration (Tr. 93), Lawrence requested an administrative hearing.  Tr. 114.  A hearing was
held before Administrative Law Judge ("ALJ") Traci Hixson on January 15, 2015.  Tr. 29-57.  In
her March 27, 2015, decision (Tr. 15-24), the ALJ determined that Lawrence could perform her

1

past relevant work, i.e., she was not disabled.  Tr. 22.  Lawrence requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on March 3, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Lawrence was born in 1958 and was 54 years old on the date her application was filed. Tr. 202.  She completed eleventh grade.  Tr. 32.  She previously worked as a mail clerk for an insurance company.  Tr. 50.  She last worked for two months in 2010 doing census work.  Tr. 36.

### B. Relevant Medical Evidence[1]

On January 28, 2003, an x-ray of Lawrence's knees was normal.  Tr. 289.  On March 2, 2006, she complained of swelling and pain in her left knee.  Tr. 285.  On examination, her left knee was not swollen or warm, but she was "tender over tibial tuberosity as well as laterally." Tr. 285.

On July 11, 2008, x-rays were again taken of Lawrence's left knee at the behest of the social security administration in connection with a prior disability application; they revealed mild joint space narrowing in the lateral compartment without other significant arthritic changes.[2]  Tr. 308.  At a follow-up to that x-ray, on July 20, 2008, Lawrence underwent a consultative

---

[1]  In her brief, Lawrence includes medical evidence dated after the hearing that she submitted to the Appeals Council.  Doc. 15, pp. 6-8.  However, she did not request a Sentence Six remand.  Thus, the Court may not consider this evidence when reviewing the ALJ's decision.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision" unless pursuant to a Sentence Six remand, citing *Cotton v. Sullivan*, 2F.3d 692, 695-696 (6th Cir. 1993)).

[2]  In May 2000, Lawrence applied for SSI; her claim was denied and an ALJ rendered a decision sometime after October 2002.  *See* Tr. 62 (prior, undated ALJ decision).  Lawrence applied for SSI again in 2008.  Tr. 174.  Her claim was denied at the initial level and she did not appeal.  Tr. 94.

2

examination by Dr. Wilfredo Paras, M.D.  Tr. 310.  Upon examination, Lawrence's left knee had crepitus and a decreased and painful range of motion.  Tr. 311, 316.

On October 1, 2012, Lawrence went to the emergency room complaining of back pain after lifting and moving furniture at home.  Tr. 336-344.  Lumbar x-rays were taken and they showed some degenerative spurring, but were otherwise unremarkable.  Tr. 373.  The attending physicians diagnosed her with muscle strain and sciatica.  Tr. 338, 343.

On October 8, 2012, Lawrence saw Tagreed Khalaf, M.D., at the Cleveland Clinic Center for Spine Health.  Tr. 330.  She complained of left knee pain; her back pain had "improved/resolved."  Tr. 330.  She also had tingling in her left foot but no weakness.  Tr. 330. She advised that her pain was exacerbated by sitting, standing, and bending forward and relieved by lying down.  Tr. 330.  Upon examination, she had decreased reflexes in her left ankle, decreased range of motion in her spine, and positive straight leg raise testing to radicular pain on the left.  Tr. 331.  She had normal sensation, full muscle strength in all areas, a normal gait, and could heel and toe walk.  Tr. 331.  Dr. Khalaf prescribed medication, referred her to physical therapy, and advised she follow up in three weeks.  Tr. 332.

On October 18, 2012, Lawrence was evaluated by the physical therapy department.  Tr. 400.  She reported that most of her pain was in her hamstring region and the heel of her left foot. Tr. 400.  Upon examination, she had an antalgic gait favoring the left side; decreased hip extension on the left and decreased push-off; reduced lumbar range of motion; decreased left knee flexion; a positive Slump test for left "thigh pain, not back pain"; mild swelling in her lumbar area; and decreased sensation in her left foot.  Tr. 402.

Lawrence had her last physical therapy visit on November 30, 2012.  Tr.390.  She reported that her condition was 50% better, she had pain only occasionally in her left leg,

assessed her pain as a "two" on a ten-point scale, and stated that pain medication provided her with "complete relief from pain."  Tr. 390.  Upon exam, she exhibited pain in her left gluteal muscle with "right side shift of trunk."  Tr. 391.  She was discharged because she met her goals of improving gait quality, increasing range of motion, decreasing pain intensity, and improving postural awareness.  Tr. 391.

A lumbar MRI performed on December 24, 2012, showed mild lower lumbar degenerative changes, including a single disk protrusion that contacted, but did not displace, the S1 nerve roots.  Tr. 501-502, 515-516.

On January 8, 2013, Lawrence returned to Dr. Khalaf complaining of low back and left leg pain.  Tr. 500.  She stated that her physical therapy was not beneficial.  Tr. 500.  Dr. Khalaf noted that he last saw her in October 2012 and that she had not followed up as recommended. Tr. 500.  Upon examination, Lawrence had a normal gait, though slightly antalgic on the left and she declined heel/toe walking due to pain; decreased lower extremity reflexes bilaterally; normal lower extremity strength bilaterally, and negative straight leg raising and other test signs.  Tr. 501.  She had left mid-buttock tenderness to palpation and decreased sensation to light touch in her left S1 dermatome.  Tr. 501.  Dr. Khalaf diagnosed her with chronic low back pain and left extremity pain "most consistent with lumbar neuritis L5-S1 in setting of disc herniation/extrusion," lumbar degenerative disc disease, and lumbar spinal stenosis.  Tr. 502. She was instructed to continue her home exercise program, start a trial of Mobic, and consult with Dr. Edwin Capulong, M.D., regarding an epidural steroid injection.  Tr. 502.

On March 1, 2013, Lawrence saw Dr. Capulong for a lumbar spine epidural evaluation. Tr. 506-510.  Upon exam, she had a normal gait, negative straight leg raising, normal strength,

4

and intact sensation.  Tr. 507-508.  Dr. Capulong assessed lumbar disc herniation and L5, S1 radiculopathy.  Tr. 508.

On March 5, 2013, Lawrence had an EMG that was stopped prematurely at Lawrence's request.  Tr. 518.  The findings were most compatible with a mild distal neuropathy, "though overlap of [illegible] factors [illegible] to body habitus could not be excluded."  Tr. 518.  Other findings were suggestive of left L5/S1 intraspinal canal lesions but could not be confirmed without adequate needle electrode examination.  Tr. 518.

On March 13, 2013, Dr. Capulong performed an epidural steroid injection on Lawrence's lumbar spine.  Tr. 511-513.  Upon examination, she had tenderness in her lumbar paraspinal muscles, a positive straight leg raise test on her left, and antalgic gait on her left.  Tr. 511-512.  She had intact sensation, normal reflexes and full muscle strength.  Tr. 512.

On December 12, 2013, x-rays taken of Lawrence's knees showed mild degenerative arthritis bilaterally.  Tr. 550.

On December 28, 2013, Lawrence saw orthopedist Carlos Higuera Rueda, M.D., complaining of bilateral knee pain.  Tr. 531-354.  She stated that she had had "progressive problems with the knee(s) most of the day over the past 8 years (left knee) and 2 years (right knee)" that interfered with her ability to engage in the following activities for the last three years: exercise, doing household chores, participating in family activities, enjoying hobbies, walking, rising from a seated position, standing for prolonged periods of time, and climbing stairs.  Tr. 531.  She stated that, because of her left knee pain, she had been relying more on her right knee, which then started becoming painful.  Tr. 532.  She reported taking over-the-counter medication 1-2 times per week "if needed" for the pain and that this helped somewhat.  Tr. 532.  She rated her current pain as 5/10 with minimal activity.  Tr. 532.  She had no other complaints.  Tr. 532.

Upon examination, Lawrence had an antalgic gait to the left and bilateral crepitus.  Tr. 533.  Regarding her left knee, she had pain with range of motion, tenderness to palpation of her patellar tendon and lateral joint line, and pain with patellar compression.  Tr. 533.  With respect to her right knee, she had pain with patellar compression.  Tr. 533.  Dr. Rueda assessed severe degenerative osteoarthritis in her knees, left more symptomatic than the right.  Tr. 531.  He wrote, "After discussion with [] Lawrence, continued non-operative management of physical therapy and NSAIDS was chosen.  She does not want to have injections at this time."  Tr. 531.

**C. Medical Opinion Evidence-state agency reviewers**

On May 10, 2013, state agency reviewing physician Gary Hinzman, M.D., reviewed Lawrence's record and adopted a prior ALJ residual functional capacity ("RFC") from November 2002, finding that Lawrence could perform light work, i.e., lift twenty pounds occasionally and ten pounds frequently, stand/walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  Tr. 76.

On August 12, 2013, state agency reviewing physician Anne Prosperi, D.O., reviewed Lawrence's record and Dr. Hinzman's opinion.  Tr. 88-89.  She agreed that Lawrence could lift twenty pounds occasionally and ten pounds frequently and sit for about six hours in an eight-hour workday, but opined that Lawrence could stand/walk for about four hours in an eight-hour workday; could frequently crouch, balance, kneel, and climb ramps/stairs; and occasionally stoop, crawl, and climb ladders, ropes, or scaffolds.  Tr. 88-89.

**D. Testimonial Evidence**

**1. Lawrence's Testimony**

Lawrence was represented by counsel and testified at the administrative hearing.  Tr. 32-49. She lives alone in an apartment and drove herself to the hearing.  Tr. 32.  At home, she

prepares meals, washes dishes, does laundry, operates a vacuum cleaner, goes shopping and pushes the shopping cart, and maintains her personal care.  Tr. 33.  Her apartment building has an elevator that she can take to her floor.  Tr. 33.  When she cooks she sometimes sits down periodically while her food is cooking.  Tr. 43.  Because she is a clean person, she keeps up with her dishes so that there is not a sink full to do all at once.  Tr. 44.  She has a tub with wheels that she takes her laundry to the machine in.  Tr. 44.  Normally her friend will come over and help with the laundry because it's hard for her sometimes to bend over and put the clothes in.  Tr. 44. Sometimes, when her friend has free time, she will perform some housework for Lawrence but everything else Lawrence maintains herself. Tr. 44.  When she cleans, she stops to sit down because her knees will start to swell.  Tr. 47.

On a typical day, she gets up between six or seven in the morning, prepares her breakfast and, if she is not going anywhere, she will read, sew, and watch television.  Tr. 34-35.  If she has "business to take care of," she schedules a ride with paratransit or her friend will come and go with her.  Tr. 35.  She naps during the day for about an hour and also talks on the telephone.  Tr. 35.  She uses a computer at the library about once a week.  Tr. 35.  She sews for about an hour a day.  Tr. 45.

Lawrence described her past work as a mail clerk for an insurance company.  Tr. 36.  She distributed the morning and afternoon mail that came in.  Tr. 35.  She lifted trays of mail that weighed about ten or fifteen pounds and carried them to different areas.  Tr. 36.

She detailed her history of knee problems.  Tr. 37.  She had surgery on her left knee in 2004 after she had torn her meniscus twice.  Tr. 37.  The doctors could not repair it so they took her meniscus out.  Tr. 37.  As a result, she gets swelling if she stands for too long and has pain from her arthritis.  Tr. 37.  She has a slipped disc in her lower back that presses against her

sciatic nerve and causes numbness down her left leg.  Tr. 37.  For pain, she takes Excedrin Migraine.  Tr. 38.

Lawrence stated that doctors want to perform surgery on her knees.  Tr. 40.  She has not tried injections in her knees.  Tr. 40.  She has tried an injection in her back but it did not work. Tr. 40.  She had physical therapy; she stated that "It was okay" and that she does exercises at home.  Tr. 40-41.

Lawrence testified that she could lift and carry about twenty pounds, but not repeatedly. Tr. 41.  She can stand on two feet for "an hour maybe" before she would have to sit down because her knees start throbbing.  Tr. 41.  She could get back up again after sitting for about twenty minutes.  Tr. 46.  She can walk for less than half a mile.  Tr. 41.  She does not use a cane. Tr. 41.  "Normally if I'm walking to the store I — there's a bus stop I have to sit."  Tr. 41. Sitting is "not really" comfortable; she starts getting a tightening pain in her lower back.  Tr. 41-42.  She can sit for "about 45 minutes, almost an hour" before she needs to get up.  Tr. 42.  Both her knees hurt when she walks up or down stairs.  Tr. 42-43.  If she drops something she can not bend down to pick it up and struggles if she has to get down on both knees.  Tr. 43.  She could crawl if she had to.  Tr. 43.

In her previous job as a mail clerk, she was on her feet most of the day.  Tr. 46.  There were chairs nearby so she could sit down sometimes even when not on break.  Tr. 46. Sometimes, she sat for five hours a day and stood for three hours.  Tr. 46.  On average, she stood for about six hours out of an eight hour day and sat for about two.  Tr. 47.  She could not spend six out of eight hours on her feet now because of the pain and the swelling.  Tr. 47.

### 2. Vocational Expert's Testimony

Vocational Expert Kathleen Rice ("VE") testified at the hearing.  Tr. 49-56.  The ALJ confirmed with the VE that Lawrence's past relevant work was as a mailroom clerk.  Tr. 50.  The ALJ asked the VE to determine whether a hypothetical individual of Lawrence's age, education and work experience could perform her past work if the individual had the following characteristics: can lift or carry twenty pounds occasionally and ten pounds frequently; can stand or walk four hours out of an eight-hour day; sit for six hours out of an eight-hour day; occasionally climb stairs and ramps but not ladders, ropes or scaffolding; can frequently balance, stoop, and crouch but not kneel or crawl; is able to reach in all directions and can handle, finger and feel; and must avoid hazardous conditions such as unprotected heights and moving machinery.  Tr. 50.  The VE answered that such an individual could perform Lawrence's past work.  Tr. 50.  The ALJ asked the VE if her answer would change if the individual had a sit/stand option so that every hour this person was standing they would have an opportunity to sit for about five minutes during which time they would not leave the work station.  Tr. 50.  The VE stated that, as long as the individual continued to stay on task during that time, her answer would not change.  Tr. 51.  She explained that the job of "mailroom clerk allows for quite a bit of change of postures and requires quite a bit of change of posture throughout the day."  Tr. 51. The ALJ asked if her answer would change if, in addition to the regular work breaks, the individual would need three additional unscheduled breaks for fifteen minutes each.  Tr. 51.  The VE replied that her answer would change because the individual would then be off-task about ten percent of the time, and that employers may take corrective action, including termination.  Tr. 52.  If the ALJ added an additional, fourth, break, that would place the individual closer to the fifteen percent off-task rate, which the VE stated is the rate at which work would be

unsustainable.  Tr. 52.  She added that taking additional breaks creates a disturbance in the workplace and may not, therefore, be tolerated.  Tr. 52-53.

The ALJ asked the VE if her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  Tr. 53.  The VE answered that it is consistent but that there are a number of things in her testimony that are not covered in the DOT, such as a sit/stand option and extra breaks.  Tr. 53.  For these items the VE relied on data and observations collected over thirty years of vocational rehabilitation practice, including helping people get and keep jobs by working with their employers, and doing job analysis, job modification, education, training, certification, and consultation with her peers to further develop and then form opinions.  Tr. 53.

Next, Lawrence's attorney confirmed with the VE that the mailroom clerk job she described was defined in the DOT as light work, and the VE agreed.  Tr. 53.  The attorney confirmed that the ALJ's hypothetical individual was limited to four hours standing or walking, which was beyond the DOT's light work definition, and the VE agreed.  Tr. 53.  The attorney asked if the VE was relying on her own expertise to find that the hypothetical individual described (standing/walking four hours) could perform a light position (standing/walking six hours).  Tr. 53.  The VE stated, "It is my opinion [based on all the aforementioned factors she uses to form opinions] that a mail, mailroom clerk position can be performed under the conditions in the first hypothetical."  Tr. 54.  The attorney asked the VE when was the last time the VE saw the job of mail clerk being performed, and the VE answered that, in "2008 ish," she placed a deaf individual in such a mail room job in a bank, that there was a chair in the mail room, and that that person had a lot of autonomy in terms of what posture to take as long as the mail got sorted and delivered.  Tr. 54-55.

10

Lawrence's attorney confirmed with the VE that, for a portion of the day, a mail clerk worker walks through the building, usually with a cart, distributing the mail and the VE agreed. Tr. 55.  The attorney asked the VE whether her answer regarding the ALJ's first hypothetical would change if the individual was limited to frequent balancing but only occasional stooping or crouching.  Tr. 55.  The VE stated that her answer would not change because those postural demands are never required of a mailroom clerk.  Tr. 56.  The attorney asked what the generally accepted rate of absenteeism was and the VE opined that a worker absent more than one day a month could not sustain employment.  Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her March 27, 2015, decision, the ALJ made the following findings:

1.      The claimant has not engaged in disqualifying substantial gainful activity since October 29, 2012, the application date.  This finding departs from that of the previous decision, but only insofar as it reflects the application date for the present claim.  Tr. 17.

2.      The claimant has had the following severe impairments: obesity, degenerative disc disease of the lumbar spine and degenerative joint disease of the bilateral knees.  This finding departs from that of the previous decision, in order to accommodate new diagnoses of obesity and osteoarthritis, and updated diagnoses related to her low back.  Tr. 17.

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  This finding adheres to that of the previous decision.  Tr. 18.

4.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant may stand and/or walk, with normal breaks, for up to four hours in an eight hour workday; the claimant may frequently balance, stoop, crouch, may occasionally climb ramps and stairs, but may never kneel, crawl, climb ladders, ropes or scaffolds; the claimant is able to handle, finger and feel, and reach in all directions but must avoid all exposure to workplace hazards, including unprotected heights and dangerous moving machinery.  Tr. 18-19.

5.   The claimant is capable of performing her past relevant work as a mail clerk, having a light exertional level designation and a specific vocational preparation factor of two.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  This finding adheres, in part, to that of the previous decision.  The previous decision identified multiple jobs comprising past relevant work, all but one of which has since been rendered obsolete by the passage of time.  Tr. 22.

6.   The claimant has not been under a disability, as defined in the Social Security Act, since October 29, 2012, the date the application was filed.  This finding departs from that of the previous decision, but only insofar as it reflects the application date for the present claim.  Tr. 23.

### V. Parties' Arguments

Lawrence objects to the ALJ's decision on two grounds.  She argues that the ALJ erred (1) when she relied on the opinion of non-treating, non-examining physician Dr. Prosperi when Dr. Prosperi did not review important records; and (2) when the ALJ accepted VE testimony despite a conflict between the VE's testimony and the DOT.  Doc. 15, pp. 10-17.  In response, the Commissioner submits that the ALJ properly considered Dr. Prosperi's opinion and the VE's testimony.  Doc. 18, pp. 8-15.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### 1.  The ALJ properly considered Dr. Prosperi's opinion

Lawrence argues that the ALJ erred because she improperly relied on state agency reviewer Dr. Prosperi's opinion despite the fact that Dr. Prosperi rendered her opinion prior to the submission of MRI and EMG evidence and before Lawrence was diagnosed with severe osteoarthritis in her left knee and moderate osteoarthritis in her right knee.[4]  Doc. 15, pp. 10-11.

The ALJ considered Dr. Prosperi's opinion:

> As to the opinion evidence, considerable weight was accorded the opinion of the state agency medical consultant, Anne Prosperi, D.O., that the claimant could perform work at the light exertional level, could stand and/or walk for up to four hours in an eight hour day, could frequently balance, kneel, crouch, climb ramps and stairs, could occasionally stoop, crawl, climb ladders, ropes or scaffolds.  Dr. Prosperi had the opportunity to examine the claimant's records, to which she cited liberally in support of her conclusions and her opinion was consistent with the medical evidence overall, which evidenced symptoms of radiculopathy at the rendering of this opinion.  However, a subsequent diagnosis of arthritis of the claimant's right knee (13F/10), suggests the slightly more restrictive limitations included in the residual functional capacity.

Tr. 22.

---

[4]  Dr. Prosperi's opinion was dated August 12, 2013.  Tr. 89.  Lawrence stated that she submitted evidence (of what, she does not explicitly state) on November 13, 2013.  Doc. 15, p. 1.

The ALJ's reliance on Dr. Prosperi's opinion was not error because, as described in more detail below, the ALJ did consider the evidence that was allegedly submitted after Dr. Prosperi's opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. Aug. 19, 2009) (rejecting an argument that the ALJ erred when he relied on a state agency reviewer's opinion that, in turn, was based on an incomplete record when the ALJ reviewed the complete record); *Helm v. Comm'r of Soc. Sec.*, 405 Fed. App'x 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.  The opinions need only be 'supported by evidence in the case record.'") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)); *Kelly v. Comm'r of Soc. Sec.*, 314 Fed. App'x 827, 831 (6th Cir. 2009) ("Absent a clear showing that the new evidence renders the prior [state agency reviewer's] opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.").

The ALJ discussed Lawrence's December 2012 MRI results, which showed mild degenerative changes with a bulge at the L5 level that contacted, but did not displace, the S1 nerve roots.  Tr. 20 (citing Tr. 502).  She explained that this finding was consistent with Lawrence's allegations of low back pain and left leg numbness caused by a pinched nerve in her back.  Tr. 20.  Dr. Prosperi discussed the October 1, 2012, lumbar x-rays and treating spine specialist Dr. Khalaf's subsequent opinion on October 8, 2012, that Lawrence's left leg symptoms were consistent with left L5-S1 radiculopathy.  Tr. 89, 332.  In other words, the December 2012 MRI confirmed what the October 2012 evidence suggested: that Lawrence's spinal issues at the L5 level caused her left leg pain and numbness.  Dr. Prosperi and the ALJ both credited Lawrence's lumbar pain that radiated to her left leg; the MRI did not add a new diagnosis, as Lawrence herself does not dispute.  *See* Doc. 15, p. 10 (Lawrence's brief stating

that the MRI and EMG evidence "objectively corroborated Ms. Lawrence's reports of significant back and lower extremity pain ..."); *Kelly*, 314 Fed. App'x at 831 (rejecting the claimant's argument that evidence not reviewed by the state agency reviewer necessitated remand because, in part, the new evidence was not very different from the initial evidence reviewed by the state agency reviewer).

The same can be said for the EMG findings, which Lawrence contends were not in the record prior to Dr. Prosperi's opinion. The EMG testing was limited, and the findings that did result were compatible with a mild distal neuropathy and suggested (but did not confirm) findings of left L5/S1 intraspinal canal lesions. Tr. 518. That Dr. Prosperi did not review an incomplete EMG test showing mild results does not support Lawrence's argument that the ALJ erred when she relied on Dr. Prosperi's opinion, especially when, as here, the EMG test results only confirmed that Lawrence's lumbar pain radiated to her left leg.

The ALJ credited Lawrence's spinal diagnostic findings (supported by the evidence, including that which was seen by Dr. Prosperi and not allegedly seen by Dr. Prosperi) as the cause of the pain in her lower back and left leg. Tr. 20. The ALJ explained, however, that substantial evidence in the record showed why this impairment would not preclude Lawrence from performing all types of work: Lawrence's physical exam findings were consistently normal; she treated conservatively, was not on any pain medication, and only took over-the-counter medication; she reported at the time she finished physical therapy in November 2012 that she had improved by 50% and was confident moving to a home exercise program; she had just one epidural steroid injection in March 2013, which was the last time she was treated for back pain, i.e., the ALJ's decision was two years after Lawrence's March 2013 visit and there was no follow up on the injection or any further treatment for her back impairment in the record in those

two years; she performed a multitude of daily activities, including personal care, typical household chores, driving, using public transportation, and shopping in stores; and she had made inconsistent statements such as telling her treating source that physical therapy was not beneficial despite stating at the time she finished her therapy that she had improved, and writing in a function report that she could walk no more than 25 feet but stating at the conclusion of her physical therapy that she could walk one mile without pain. Tr. 20-22.  Lawrence does not challenge these portions of the ALJ's decision.

Next, Lawrence argues that the ALJ improperly relied on Dr. Prosperi's opinion because she was diagnosed with arthritis in her right knee after Dr. Prosperi's opinion. Doc. 15, p. 12. This argument fails.  *See McGrew*, 343 Fed. App'x at 32.  The ALJ acknowledged that Dr. Prosperi's opinion was issued prior to the diagnosis of arthritis in Lawrence's right knee and, as a result, assessed an RFC that was slightly more restrictive than Dr. Prosperi's RFC assessment. Tr. 22.  Lawrence argues that the ALJ's RFC assessment is incorrect because the only further restriction the ALJ gave vis a vis Dr. Prosperi's opinion is that Lawrence is precluded from exposure to workplace hazards.  Doc. 15, p.12.  Even if the ALJ's RFC only added a limitation regarding workplace hazards, such an RFC would be accurately characterized as "slightly more restrictive" than Dr. Prosperi's RFC.  And the ALJ's RFC also limited Lawrence to occasionally climbing ramps and stairs and never kneeling, crawling, or climbing ladders, ropes or scaffolds, which are all greater restrictions than found in Dr. Prosperi's RFC.  Tr. 19, 22.

Lawrence contends that the diagnosis, post-Dr. Prosperi, of severe arthritis in her left knee and moderate arthritis in her right knee, warrants more than a "slightly more restrictive" RFC.  Doc. 15, p. 12.  She argues that "the evidence that the ALJ cites (Tr. 531) not only includes a subsequent diagnosis of osteoarthritis of the right, but, for the first time, a diagnosis of

'severe degenerative osteoarthritis' of the left knee as well (Tr. 521, 524)."  However, as detailed above, the ALJ did not dispute that Lawrence had impairments evidenced by diagnostic exams of her knees and back that limited her ability to perform work.  The ALJ explained that, with respect to Lawrence's knees, she had consistent normal examination findings, including on the day of her visit in December 2013 when she was diagnosed with bilateral arthritis (range of motion 0 to 110 degrees, normal stability, normal sensation, no muscle atrophy); she followed no prescriptive medication regime, instead relying on over-the-counter medications; and she had not pursued treatment since December 2013 and had declined injections and surgical intervention. Tr. 20.  Thus, the ALJ's RFC is supported by substantial evidence.

Lawrence asserts that had all this evidence—the MRI, EMG, and bilateral knee osteoarthritis diagnosis—been provided to a medical expert, that expert would have reached the only "logical" conclusion: that she is unable to perform the standing and walking components of light work. Doc. 15, pp. 13-14.  Again, the MRI and EMG evidence is cumulative and the ALJ further reduced the RFC offered by the medical expert, Dr. Prosperi, based on Lawrence's subsequent bilateral osteoarthritis diagnosis.  Finally, the ALJ's RFC limited Lawrence to standing/walking four hours out of an eight-hour day, less than the six hours defined in a full "light" work category.  Lawrence herself testified that she could stand for about an hour at a time and walk for less than a half mile (Tr. 41, 45-46).  Her testimony belies her assertion that she could not stand/walk for four hours in an eight-hour workday.

The ALJ did not err when she considered Dr. Prosperi's opinion.  Her decision is supported by substantial evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (so long as there is substantial evidence to support the ALJ's determination, the Commissioner's decision must be affirmed).

## 2.  The ALJ properly considered VE testimony

Lawrence argues that the ALJ erred in accepting VE testimony that conflicted with the DOT.  Doc. 15, p. 14.  The VE testified that the mail clerk position is identified as "light" in the DOT (six hours a day standing/walking) but that it can be performed within the parameters of the ALJ's posited hypothetical (four hours a day standing/walking).  Tr. 53-54.  She stated that her testimony was, therefore, inconsistent with the DOT, and that the portion of her testimony that veered from the DOT was based on her experience.  Tr. 53, 54.

When there is an inconsistency between VE testimony and the DOT, an ALJ must elicit a reasonable explanation for the conflict before relying on the VE's testimony in her decision.  SSR 00-4p, 2000 WL1898704, at *2.  Here, the VE explained that there was a conflict between her testimony and the DOT and provided a reasonable explanation for her testimony despite the conflict, i.e., her 30 years of experience in vocational rehabilitation practice, including helping people get and keep jobs by working with employers, performing job analysis and modification, education, training, certification, and consultation with her peers.  Tr. 53, 54.  In her decision, the ALJ explained,

> In response [to] the questions of the claimant's representative, the [VE] testified that standing and/or walking for four of eight hours would not preclude this job because the job of mail clerk "typically allows for a considerable amount of moving about, sitting or standing" (hearing testimony).
>
> Pursuant to SSR 00-4p, the [VE's] testimony is not consistent with the information contained in the [DOT]; however, a reasonable explanation exists for the discrepancy.  The [DOT] indicates that this job requires standing and/or walking for up to six hours of an eight hour workday.  However, the [VE] indicated, based on her professional experience and expertise, that, because the job is typified by sitting, standing and moving about with great autonomy on the part of the worker, standing and/or walking for four hours per day would not be an impediment to the performance of this job.  Further, the [VE] explained that any other variances in the testimony, to the extent that it differed from the [DOT], is based on experience and training as a [VE].

Tr. 23.  Thus, the ALJ noted the inconsistency between the VE's testimony and the DOT and she elicited a reasonable explanation for the conflict before relying on the VE's testimony in her decision.  In short, she complied with the requirements set forth in SSR 00-4p and did not err. *See* 2000 WL1898704, at *2.

Lawrence makes numerous attempts to undercut the ALJ's decision, none of which are persuasive.  She first takes issue with the timing of the ALJ's elicitation of a reasonable explanation at the hearing, complaining that the ALJ only asked about a discrepancy after she set forth a sit/stand option in her hypothetical.  Doc. 15, p. 15.  Lawrence also complains that the VE acknowledged a discrepancy in the six hour/four hour requirement only when counsel questioned her about this discrepancy.  Doc. 15, pp. 15-16.  SSR 00-4p, however, does not set forth a timing sequence an ALJ must adhere to during the hearing or state that a discrepancy with the DOT discussed by the VE voids the VE's testimony when it is revealed in response to a question from the claimant's attorney.  Finally, Lawrence complains that, when her attorney asked when the last time the VE saw the job of mail clerk being performed, the VE stated that she had previously placed one individual in a job of mail clerk over six years prior to the decision and that this one person, in this one position, had autonomy regarding her position while working.  Doc. 15, p. 16.  Lawrence does not, however, identify legal authority directing a minimum threshold for employee placement before a VE's testimony can be credited.

In sum, Lawrence does not identify an error that the ALJ committed; instead, she disagrees with the ALJ's decision and asks this Court to reweigh the evidence in her favor.  This the Court cannot do.  *Garner*, 745 F.2d at 387 (A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."); *Huan v. Comm'r of Soc. Sec.*, 107 Fed. App'x 462, 465 (6th Cir. 2004) (rejecting the claimant's argument that the ALJ relied

on VE testimony over the claimant's testimony: "We may not reweigh conflicting evidence on appeal, but instead must affirm" the ALJ's decision when supported by substantial evidence). The ALJ's decision is supported by substantial evidence and must be affirmed.

### VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

Dated: December 14, 2016

Kathleen B. Burke
United States Magistrate Judge